STATE, Respondent v. EAKES, Appellant

(206 N.W.2d 272)

(File No. 11061. Opinion filed April 5, 1973)

Order denying petition for rehearing May 9, 1973

Lee R. Burd, Marvin K. Bailin, Christopherson & Bailin, Timothy J. Nimick, Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellant.

Gordon Mydland, Atty. Gen., Michael J. McGreevy, William J. Srstka, Jr., Asst. Attys. Gen., Pierre, for plaintiff and respondent.

WINANS, Justice.

The defendant in this case was charged with and found guilty by the municipal court of Sioux Falls, South Dakota of possession with intent to exhibit obscene matter, contrary to SDCL 22-24-12. To understand the rather numerous assignments of error made by the defendant in his appeal it is necessary to set forth with some detail the factual situation.

On August 10, 1971, two Sioux Falls police officers, Edgar Flowers and Max Madsen, while wearing plain clothes, purchased tickets to view two films, "Danish Pastry" and "Obscene Plot", at the Studio I Theater. These officers had previously received complaints as to these films. After sitting through the showing of both films the officers returned to the police department, swore out a complaint against the defendant and obtained an arrest warrant signed by the judge of the municipal court. The officers then returned to the theater and placed the defendant under arrest. The defendant, Eakes, was the person from whom the

officers had purchased their tickets to view the film and upon their return the second time, they found the defendant standing near the ticket counter in the lobby of the theater in close proximity to both the projection area and the rolls of tickets. After displaying the arrest warrant to the defendant one of the officers walked through a set of drawn curtains into the area designed for the seating of patrons where 18 to 30 people were viewing one of the named pictures being projected on the screen. The officer returned to the lobby where the defendant was still standing and opened a door to the projection room. The officer requested that Mr. Eakes remove the rolls of film which they then took, and upon request they also were given the tickets. The officers testified that the projection room was very small, in close proximity to where the defendant was standing and there were holes in the wall of the projection room through which the film was being projected upon the screen. They testified they made the arrest and subsequent seizure of the film on their own determination as to the content of the film after they had viewed it. No search warrant was issued in this case.

On August 11, 1971, the defendant moved the court to return the films and tickets and to suppress their use as evidence against him. After a hearing the following day defendant's motion was denied. Mini-Kota Art Theaters thereafter moved for restoration of the seized property under SDCL 22-24-22. Hearing was held on the motion at the time of defendant Eakes' preliminary hearing, August 17, 1971, pursuant to agreement of the parties. The court denied the motion finding probable cause to believe the films to be obscene. The defendant was bound over for trial. The State's case consisted of the testimony of the two arresting officers and the showing of the films previously seized and their reception into evidence, and cross-examination of defendant's witness. The defense consisted of testimony from a church leader, a magazine and book distributor, a housewife and mother, a psychiatrist, a working man and father, and the attorney for the corporation. The defendant also introduced into evidence books, magazines and certain pages of the Sioux Falls Argus Leader containing advertisement for Studio I.

The defendant appeals from the judgment of the court which found him guilty.

The questions presented by the numerous assignments of error are set forth by the defendant in four separate points in the following language:

"1. Did the Court err in permitting the use of two films as evidence against defendant Eakes because the films were the product of an unlawful search and seizure performed under authority of certain sections of SDCL 22-24 which are unconstitutional abridgments of defendant's right to freedom of expression, thereby violating defendant's rights under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States and corresponding sections of the Constitution of the State of South Dakota?

2. Was there sufficient evidence to support a finding that the films used as evidence against defendant were 'obscene' as that term is defined by law?

3. Did the systematic exclusion of evidence offered by defendant showing that the films were not 'obscene,' as that term is defined by law, deprive the defendant of a lawful defense?

4. Was there sufficient evidence to support a finding that the defendant committed the offense charged with the intent required by law to be proven against him as an element of that offense?"

It was held in Jacobellis v. Ohio, 378 U.S.184, 84 S.Ct. 1676, 12 L.Ed.2d 793,

"Motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press. Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098. But in Roth v. United States and Alberst v. California, 354 U.S. 476, 77 S.Ct. 1304,

1 L.Ed.2d 1498, we held that obscenity is not subject to those guarantees. Application of an obscenity law to suppress a motion picture thus requires ascertainment of the 'dim and uncertain line' that often separates obscenity from constitutionally protected expression. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584, 590; see Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460, 1472.[2]"

Note 2 in the opinion by Mr. Justice Brennan in the Jacobellis case states the law applicable to our case:

"It is too late in the day to argue that the location of the line is different, and the task of ascertaining it easier, when a state rather than a federal obscenity law is involved. The view that the constitutional guarantees of free expression do not apply as fully to the States as they do to the Federal Government was rejected in Roth-Alberts, supra, where the Court's single opinion applied the same standards to both a state and a federal conviction. Cf. Ker v. California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726, 737; Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, pp. 660, 661."

Under point 1 of appellant's appeal he argues that the seizure was not justified because it was the product of a warrantless search and because there was no adversary hearing or other judicial proceeding directed to the issue of obscenity prior to seizure.[1] In the recent case of State of Minnesota v. Carlson, Minn., 202 N.W.2d 640, the Supreme Court of Minnesota held that obscene materials are not protected under the first amendment. We quote from that case with approval as follows:

"The United States Supreme Court in a series of decisions has attempted to spell out certain rules applicable to the consideration of obscenity cases. One of the

---

1. See Article entitled "Seizure of Allegedly Obscene Films", South Dakota Law Rev. Vol. 15, No. 2, p. 399.

leading cases in this field is Roth v. United States, (citation omitted). In that case, Roth, a New York businessman, was charged with using the mails to solicit sales of obscene materials in violation of the Federal obscenity statute. 18 U.S.C.A. § 1461. His conviction was affirmed. In that case the majority of the court explicitly rejected the argument that obscenity is within the area of constitutionally protected speech or press under the First and Fourteenth Amendments. Subsequent cases have not changed this express statement but have reaffirmed it. In United States v. Reidel, 402 U.S. 351, 354, 91 S.Ct. 1410, 1412, 28 L.Ed.2d 813, 816 (1971), the court held:

'* * * Roth has not been overruled. It remains the law in this Court and governs this case.'

In the Roth case the supreme court formulated a test to be applied in determining whether material is obscene (354 U.S. [at] 489, 77 S.Ct. [at] 1311, 1 L.Ed.2d [at] 1509):

'* * * [W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' "

The court in State v. Carlson, supra, also wrote:

"If any pattern has developed from the decisions, it appears that hard-core pornography is outside of the scope of Redrup, whatever its application is claimed to be. Mr. Justice Stewart in his dissent in the Ginzburg [Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31] case indicated that hard-core pornography is obscene and is not protected. He defined hard-core pornography as follows (383 U.S. [at] 499, note 3, 86 S.Ct. [at] 957, 16 L.Ed.2d [at] 54):

'* * * Such materials include photographs, both still and motion picture, with no pretense of

artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgylike character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material * * * cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment.'

When confronted with hard-core pornography, the United States Supreme Court will affirm the lower court or deny certiorari. We adopt the above-quoted definition of hard-core pornography and hold that such materials have no constitutional protections."

 This court likewise adopts the above quoted definition of Mr. Justice Stewart of hard-core pornography and holds that such materials have no constitutional protection. We have no hesitation in applying that definition to our case in determining that the films shown are hard-core pornography, are obscene and are not constitutionally protected.

 The law enforcement officials were operating under two statutes:

SDCL 23-22-7. "A peace officer may, without a warrant, arrest a person:

(1) For a public offense committed or attempted in his presence; * * *"

SDCL 22-24-21. "Every person who is authorized to arrest any person for a violation of §§ 22-24-11 to

22-24-26, inclusive, is equally authorized to seize any obscene matter found in the possession or under the control of the person so arrested and to deliver the same to the court before whom the person so arrested is required to be taken."

The arresting officers had an arrest warrant which had been issued upon their complaint, based upon their having previously viewed the films in their entirety, and their determination that they were obscene. They determined that a misdemeanor was being committed in their presence and when they returned to serve the arrest warrant, it was still being committed and in their presence. They were therefore entitled and within their right to make a search incidental to the arrest.

Both the plaintiff and the defendant have cited the case of Chimel v. California, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The court in that case stated:

"* * * it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. * * * There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

In the Chimel decision, the court quoted with approval Peters v. New York, 1968, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 as follows:

"We sustained the search, however, only because its scope had been 'reasonably limited' by the 'need to seize weapons' and 'to prevent the destruction of evidence,' * * * We emphasized that the arresting officer 'did not engage in an unrestrained and thoroughgoing examination of Peters and his personal effects. * * *' "

In Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067, the court stated, "It has long been settled that

objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." (citations omitted).

In Hosey v. City of Jackson, 1970, DC Miss., 309 F.Supp. 527, the Mississippi court held in favor of the contention that a seizure of an obscene film was made incident to a lawful arrest. That holding was an extension of the holding in McGrew v. City of Jackson, 1969, DC Miss., 307 F. Supp. 754, where the court held in an obscenity case involving a seizure similar to the one in question as follows:

"These officers lawfully arrested the plaintiffs upon viewing the *entire* Fox film for a violation of this obscenity statute in their presence. Pursuant to such valid arrest, these peace officers had the lawful right to seize this film as they did as an instrument of the crime. The defendants have the right to use that film in evidence as proof of this crime."

We also quote with approval the following citation from the Minnesota Supreme Court opinion of State v. Lebewitz, 294 Minn. 424, 202 N.W.2d 648:

"Mindful of our sworn duty to enforce First Amendment rights, our review of the record, which included viewing the film to independently determine the issue of obscenity vel non as prescribed by Jacobellis v. Ohio (citation omitted) proceeds on the fundamental that the First Amendment prohibits criminal prosecution for the public dissemination of any form of alleged obscene materials, including moving pictures, which does not satisfy the definition of obscenity as set forth in Roth v. United States, (citation omitted) A Book Named 'John Cleland's Memoirs of a Woman of Pleasure' v. Attorney General, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); and where applicable, Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). Applying, then, the constitutional standards announced by decisions of the United States Supreme

Court as reviewed in State v. Hoelscher, *supra*, 294 Minn. 433, 202 N.W.2d 640, we hold that the content of the film commercially exhibited to the general adult public constitutes hard-core pornography and the city's criminal prosecution of defendants responsible for its exhibition is constitutionally permissible. See, Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966). We are fully persuaded that under the Roth-Memoirs test the film has the required appeal to a prurient interest of the average person in sex. Nor do we entertain any doubt that an explicit motion picture portrayal of nude couples engaged in sexual intercourse is patently offensive because it goes beyond customary limits of candor and affronts contemporary community standards."

We add to the above that we find the films in this action to be utterly without any redeeming social value.

The search and seizure of which defendant complains in this appeal was neither extensive in physical scope nor intensive, therefore being vastly different in character from the search and seizure in Chimel.

The court in Hosey v. City of Jackson, Mississippi, supra, where police officers seized a film without any warrant after viewing the film, stated its approval of seizing an allegedly obscene film incident to a valid arrest. The reasons for such a holding were stated thusly:

"The film itself is unquestionably the best evidence in any criminal prosecution for the public showing of an obscene movie. More importantly, however, it is a well known fact that moving picture films may be and often are altered by adding or deleting one or more scenes for showing at a particular theater or exhibition. The absolute necessity of retaining an exact content of the film as shown at the time of the commission of the alleged offense is obvious. The plaintiffs have failed to present one legitimate reason why an allegedly obscene film

should not be seized and held as evidence of a criminal offense committed in the presence of the arresting officers."

The Hosey court dealt with Chimel in a footnote which stated:

"This Court is cognizant of the recent decision of Chimel v. State of California, (citation omitted) limiting the permissible bounds of search and seizure incident to a lawful arrest without first obtaining a search warrant. * * * The right and even the duty of police officers to seize the evidence which was the very means or vehicle of the commission of a crime committed in the officers' presence is not, in this Court's opinion, affected by the holding in *Chimel*. To prohibit the seizure of such evidence under these circumstances would completely frustrate criminal prosecution, and necessarily, the arrest for a crime witnessed by the arresting officers."

■ The defendant, among other things, contends that an adversary hearing prior to seizure is required in obscenity cases. True, it is stated by the dissenting opinion in the case of People v. Johnson, 1970, 29 Mich.App. 118, 185 N.W.2d 150, "The weight of authority heavily supports the view that a motion picture film being held for public exhibition may not be seized except pursuant to a search warrant issued following an adversary hearing." The dissenting judge sets forth many of the cases so holding, among which is one taken from the Eighth Circuit Court of Appeals, United States v. Alexander, 1970, 8 Cir., 428 F.2d 1169. However, the majority opinion in People v. Johnson, supra, found to the contrary in the following language:

"We find, however, no United States Supreme Court cases extending this requirement to motion pictures. Lee Art Theatre, Inc. v. Virginia (1968), 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313, held that the seizure of a movie pursuant to a warrant issued on the strength of conclusory assertions of a police officer was invalid. Absent inquiry by the issuing magistrate into the factual basis for the officer's conclusions, the proce-

dure there fell short of the constitutional requirements demanding recognition of freedom of expression. There is nothing in *Lee, supra,* to suggest that a prior adversary hearing is required. We note that the affidavits in this case were sufficiently detailed so as to meet the requirement found in *Lee, supra.*

While we recognize that other courts have extended the requirement of a prior adversary hearing to the medium of motion pictures, we conclude that here the officers, after viewing the entire movie and obtaining an arrest based on affidavits containing a sufficient factual foundation for the crime charged, were empowered to make a valid arrest. The seizure of the film was reasonable and lawful, being contemporaneous with a proper arrest and evidence of the crime. People v. Bloss (1969), 18 Mich.App. 410, 171 N.W.2d 455; 2 Gillespie, Michigan Criminal Law & Procedure (2d ed.) § 869."

In United States v. Alexander, supra, the government seized nearly 1700 reels of 29 different film titles and 266 copies of eight different magazines and booklets. The court held:

"In view of the above discussion, it is manifest that the wholesale seizure of films, magazines and booklets prior to holding an adversary hearing on their obscenity was violative of appellants' constitutional rights. It follows that on remand, the district court shall enter an order requiring the materials seized to be returned. However, we also adopt the teachings of the Seventh Circuit in Metzger v. Pearcy, 393 F.2d 202 (1968), and the Fourth Circuit in Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (1969), and hold that the order for return shall be without prejudice to the district court to compel appellants to deliver, on request of the United States Attorney for the District of Minnesota, one copy of each of the titles described in the warrants for use in connection with any criminal prosecution initiated by the Government."

Our case is distinguishable from Alexander, supra, in that only one film of each title was seized. True, this may have been

all the theater had but this isn't the same kind of a wholesale seizure that is discussed in Alexander. Also we note with interest that the court of its own volition directed the lower court upon application to compel to be delivered to the United States Attorney for use in a criminal prosecution "one copy of each of the titles". The films in our case were used in the criminal prosecution.

Also, SDCL 22-24-22 provides for a prompt hearing on the matter of obscenity and that prompt hearing was had as we have heretofore set forth.

In Hosey, supra, the same issue was presented to the federal court. In that case the plaintiffs appealed and alleged that there could be no seizure of allegedly obscene material without a prior adversary hearing. The court ruled otherwise in the following language:

> "This Court is of the opinion that any judicial hearing prior to the seizure of an allegedly obscene film at the time of exhibition would completely frustrate the purpose and operation of the Mississippi statute prohibiting the exhibition of obscene movies. Certainly, if a prior judicial hearing were required, it would be necessary for the hearing judge to view the film as exhibited on the occasion giving rise to the prosecution. To require a judge to proceed from one theater to another or attend numerous showings of a film at a particular theater with the mere possibility of viewing an obscene version is untenable. Furthermore, to require that the film be brought into Court or that arrangements be made for a private showing of the film in a particular theater provides no guarantees against the cutting or alteration of the film prior thereto. Finally, if police officers, after viewing an obscene film, were required to leave the theater in order to obtain a judicial determination on the question of obscenity by merely reporting the contents to the proper judicial officer, a judicial determination under such conditions would not only be extremely difficult and subject to error, but by

the time a seizure could be made, the film might be altered or even shipped to another theater or location. This would be particularly true in so called 'quickie movies' or 'premier performances,' the same or any versions of which might never again be shown at the same location. A procedure which is not unreasonable and not oppressive should not be condemned so as to completely frustrate a state's legitimate right to prohibit the public showing of obscene movies."

The Supreme Court of the State of Washington in the case of State v. Rabe, 79 Wash.2d 254, 484 P.2d 917[2], has held that a preseizure adversary hearing is not required. We quote from their opinion:

"We disagree with the 7th Circuit *Metzger* decision and its progeny that *Marcus* [Marcus v. Search Warrant of Property, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127] and A Quantity of Books [A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809] and Joseph Burstyn, Inc. v. Wilson, (citation omitted) Kingsley Int'l Pictures Corp. v. Regents, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512, (1959), Jacobellis v. Ohio, (citation omitted) necessarily require a prior *adversary* hearing on the issue of obscenity before a *motion picture film* can be confiscated as evidence. In fact, *Burstyn, Kingsley Pictures,* and *Jacobellis* did not consider the specific question of a prior adversary hearing. In both *Marcus* and *A Quantity of Books* the statute being enforced called for civil proceedings directly against the materials and for their eventual destruction. In both instances, the police impounded all of the allegedly obscene publications they found on the premises. Most crucially, the great amount and variety of materials seized without sufficient judicial guidance created a substantial risk that nonobscene publications would also be suppressed. Certainly the scope

2. State v. Rabe, quoted above, has been overruled for reasons other than our quote. See Rabe v. State of Washington, 1972, 405 U.S. 313, 92 S.Ct. 993, 31 L.Ed.2d 258.

and consequences of those seizures warranted the imposition of additional procedural safeguards. But the necessity for a prior adversary hearing is substantially less when, as here, the seizure is limited to a single item, the detention is temporary, and the action is initiated only after a cautious judicial scrutiny of the sensitive issues involved."

The Supreme Court of Kentucky in Roaden v. Commonwealth, 1971, Ky., 473 S.W.2d 814, held that the sheriff who viewed public showing of a movie and concluded that it was obscene and who thereupon arrested the manager of the drive-in theater was authorized in seizing the film shown notwithstanding that no prior adversary hearing on the issue of obscenity had been held. The Supreme Court of Ohio in State v. Albini, 1972, 31 Ohio St. 2d 27, 285 N.E.2d 327, holds that a preseizure adversary hearing is not constitutionally required in every case and that the first amendment was not violated by seizure of a single copy of allegedly obscene film for the sole purpose of preserving it as evidence for criminal prosecution, though no adversary hearing was held prior to seizure.

The defendant also contends that the South Dakota statutes relating to obscenity are unconstitutional because, among other contentions, defendant states that the statute defining "obscene", SDCL 22-24-11(1) and (2), is at variance with constitutional guidelines and that therefore the entire act is unconstitutional.

■ The test of whether material is obscene or not under the Roth-Memoirs test may be summarized as follows: Material is obscene if three criteria are satisfied. (1) To the average person the dominant theme of the material taken as a whole appeals to prurient interest in sex; (2) the material is patently offensive because it affronts contemporary community standards relating to a description of sexual matters; and (3) the material is utterly without redeeming social value. Without laboring the point at length, we hold that the statutory definition of prurient interest incorporates those standards set down by the United States Supreme Court. The tests for obscenity which are deemed constitutional requirements become a part of that statute. The court in Hosey, supra, stated the same problem as follows:

"The question before the Court is thus whether a criminal obscenity statute must incorporate by legislative act all present and necessarily future tests for obscenity as enunciated by the Supreme Court in order to be valid.

The answer to this query is in the negative. It is neither possible nor is it the function of a criminal statute to set out all the judicial tests for a proper determination of whether a violation of the statute has been committed."

The appellant argues that the state failed to sustain its burden of proof by failing to produce sufficient evidence to support a finding that the films used as evidence against the defendant were obscene, as that term is defined by law. The state did produce the two films and also the sworn testimony of the two officers who had viewed them. The court itself viewed the films acting in this case as judge and jury. This same contention of insufficiency of the evidence was advanced in State v. Carlson before the Supreme Court of Minnesota, 291 Minn. 368, 192 N.W.2d 421, and answered by that court in the following language:

"Defendants argue that the state did not present sufficient evidence to sustain the jury's finding of guilty on any of the 29 counts, contending that no evidence was offered to establish the elements of the offense—that the dominant theme of the materials taken as a whole appeals to a prurient interest in sex; that the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and that the material is utterly without redeeming social value. They contend it was error to allow the jury to make a decision on the contents of the films without receiving any aid in ascertaining the contemporary community standard or the question of lack of social value. These arguments are not persuasive. We concur with decisions which have expressly or impliedly concluded that a jury, properly instructed, is fully capable of determining whether con-

duct or material appeals to a prurient interest and offends contemporary community standards, without expert testimony on the subject, and that such testimony is not essential to appellate review. Kahm v. United States, 300 F.2d 78 (5 Cir. 1962), cert. den., 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962)."

The Supreme Court of the State of Wisconsin in State v. Amato, 1971, 49 Wis.2d 638, 183 N.W.2d 29, held

"The question of obscenity is not exclusively one of fact. It has been termed a mixed question of fact and constitutional law. This court has recognized that a judgment of obscenity is not an ordinary issue of fact, but rather one also involving issues of legal and constitutional interpretation. McCauley v. Tropic of Cancer (1963), 20 Wis.2d 134, 148, 121 N.W.2d 545."

Quoting further from the same case:

"The appellants contend that in the absence of affirmative proof of 'contemporary community standards' through expert testimony, the state cannot prevail. Several cases are cited in support of this contention. However, the appellants concede that some courts have held that affirmative proof on the issue of community standards is not necessary in obscenity cases. However, they contend the decisions are in the minority, most are pre-*Redrup* [Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515] and in many of them there is a finding that the material involved is hard-core pornography, i. e., material which depicts sexual activity.

We believe that the mere existence of the magazines here involved was sufficient without expert testimony to present a jury question.

We conclude that expert testimony is not required."

The defendant complains of the court's exclusion of certain evidence which defendant attempted to offer. We think the court

allowed the defendant to put in his defense before the court; that if the court was restrictive with the introduction of some of the evidence offered, it was simply cumulative and at all events would at most be harmless error.

In answer to appellant's final contention that the state did not produce sufficient evidence to support the intent required by law to be proven against the defendant as an element of that crime we point out SDCL 22-24-11(6) which defines that requirement as follows:

> " 'Knowingly' means having actual or constructive knowledge of the contents of the subject matter. A person has constructive knowledge of the contents if he has knowledge of facts which would put a reasonable and prudent man on notice as to the suspect nature of the material, and the failure to inspect the contents is either for the purpose of avoiding such disclosure or is due to reckless conduct."

The word "knowingly" ordinarily means that the act or omission was intentional; it is not necessary that the actor intended to break the law, but it is enough that he intended the act.

The testimony was that the defendant was running the projector, selling the tickets and the only person in the theater exercising any visible control over the management of the theater.

We would also point out for whatever evidentiary value it may have had with the trier of the fact that at the trial of this action one of the officers was there questioned:

> "Q What did you hear Mr. Eakes say?
>
> A Well, when the—when the second film, 'Obscene Plot,' had came to an end, Mr. Eakes came into the movie and he said, 'Just a moment, folks,' he said, 'it will only be a few moments, I have to rewind the film,' and, 'I have to rewind this film; it will only be a few minutes'."

For all of the reasons hereinbefore set forth, we affirm the judgment of the municipal court, finding the defendant guilty.

Affirmed.

BIEGELMEIER, C. J., and HANSON, J., concur.

WOLLMAN, J., dissents.

DOYLE, J., not participating.

WOLLMAN, Justice (dissenting).

The seizure of the films in this case cannot be upheld under the rationale of Chimel v. California, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, nor under the plain view doctrine as set forth in Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067. *Chimel* does not apply because the films were not within the area within appellant's immediate control, insofar as that area has been defined to include the area within which a person might destroy evidence or seize a weapon. *Harris* does not apply because there was no inadvertent view of the films by the officers at a place, i. e., the projection booth, where they had a right to be. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. There were no exigent circumstances which would have justified a seizure without a search warrant. The officers had seen the films earlier in the afternoon. There was no evidence whatsoever to indicate that the films were about to be secreted or destroyed. While it would have taken the officers more time to prepare an affidavit adequate to support a search warrant than it did for them to obtain the warrant of arrest, mere personal inconvenience has never been held to be enough to dispense with the requirement of obtaining a search warrant. Of course, I do not question the officers' good faith in relying upon what they considered to be a valid statute, SDCL 22-24-21, purporting to give them the authority to seize the films.

Had the officers obtained a search warrant, then I would agree with the majority that no adversary hearing would have been required prior to a seizure of the films. United States v.

Young, 9 Cir., 465 F.2d 1096. In any event, we shall soon have further guidelines on this question. See People v. Heller, 29 N.Y.2d 319, 327 N.Y.2d 628, 277 N.E.2d 651, cert. granted, 406 U.S. 916, 92 S.Ct. 1765, 32 L.Ed.2d 115; Roaden v. Kentucky, 473 S.W.2d 814, cert. granted, 406 U.S. 905, 92 S.Ct. 1609, 31 L.Ed.2d 815.

Although my view concerning the seizure of the films would necessitate a reversal of the conviction, I feel duty bound to comment upon other issues discussed in the majority opinion. First, although I agree generally with the definition of hard-core pornography adopted by the majority opinion, I cannot agree that the films in question fall within that definition.* Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793, 804 (Stewart J., concurring). Although the majority opinion has no hesitation in branding the films as hard-core pornography, it does not deign to describe that which it condemns. The following quotation from Huffman v. United States, D.C.Cir., 470 F.2d 386, is instructive:

> "There is a tendency to dispose of cases like these with conclusory condemnations, often based on overdrawn descriptions. If we read the Supreme Court decisions aright, what is required is a factual description of contents and an analysis of what is being presented rather than what is being suggested.
>
> "Judges concerned with the many elements comprised in our free, democratic society must take care lest they decide these cases on the basis simply of their indignation and disgust with the kind of trash presented. The First Amendment extends to trash, if it stops short of obscenity, not because of its merit but because of the dangers to the free spirit generated by a system of censorship and authority delegated to censoring officials." 470 F.2d 386, 396.

---

* The films depict scenes of nudity and simulated sexual activity, but there is no portrayal of actual, explicit intercourse or other sexual involvement; indeed, the cameramen and actors were quite careful to avoid such a portrayal.

To hold that the films in question are not hard-core pornography is not to pen a paean to obscenity. I found the films to be tedious, tawdry assaults upon both the spirit and the intellect. Although they might possibly have some appeal to a sweaty-palmed adolescent, one would have to be possessed of a panglossian ingenuousness to find any redeeming social value in either of the films.

Although the films might well be held to meet two of the *Roth-Memoirs* tests, i. e., an appeal to prurient interest in sex and an utter lack of redeeming social value, the three tests must coalesce and each of the three criteria must be applied independently. Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1. In this respect it is my opinion that the state failed to introduce sufficient evidence to support a finding that the films were patently offensive because they affronted contemporary community standards relating to the description or representation of sexual matters. Had I viewed these films five years ago, I might very well have concluded that they went beyond the pale of contemporary community standards relating to descriptions of sexual matters. From a rather desultory viewing of the offerings at the local theaters over the past two years, however, and from a reading of current literature and criticism, I am convinced that that which once would have shocked the community is now regarded as passé.

The standard by which allegedly obscene materials are to be judged, then, is constantly self-correcting: as the standards of the community change with respect to acceptable descriptions of sexual matters, that which was once proscribed may find itself to be constitutionally protected. Hard-core pornography has never fallen within the realm of this protection, however, and if we are permitted to indulge in our subjective preferences, it will never be so protected. If the films could truly be categorized as hard-core pornography, then they would speak for themselves and no expert opinion would be necessary on the question of contemporary community standards. United States v. Wild, 2 Cir., 422 F.2d 34, cert. den. 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152; United States v. Young, supra.

I would hold that the state is required to submit evidence concerning contemporary community standards relating to the description or representation of sexual matters in all obscenity prosecutions except those in which the material in question is clearly hard-core pornography. While a jury and a judge may accurately reflect contemporary community standards regarding hard-core pornography, I am not prepared to say that in this day of rapidly changing standards the average jury is sufficiently well informed regarding these matters in cases falling short of hard-core pornography to be able to make the judgment that the material in question is obscene when weighed against the three constitutionally required standards enunciated in the *Roth-Memoirs* cases.

From the viewpoint of an appellate court, it would have been better had this case been tried to a jury inasmuch as the issues would have been more sharply framed by the court's instructions. It is difficult to tell from the record whether the trial court in fact applied the *Roth-Memoirs* standards. Certainly the trial court was unduly restrictive in ruling upon appellant's proffered testimony.

Nothing said in this dissent should be construed as in any way indicating that the films in question could not, under proper instructions, based upon competent evidence, be held to be obscene. Our duty, however, is to apply the constitutional standards as proclaimed by the United States Supreme Court and not to base our decision upon our purely subjective views of what is or is not obscene. Accordingly, if there were no question as to the propriety of the seizure of the films, I would reverse and remand for a retrial in accordance with the procedures I have discussed above.